# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

Brian A.,                          )
                                   )
      Plaintiff,            )
                                   )
v.                                 )    No. 18 CV 50236
                                   )    Magistrate Judge Lisa A. Jensen
Andrew Saul,                       )
Commissioner of Social Security,   )
                                   )
      Defendant.            )

## MEMORANDUM OPINION AND ORDER[1]

In 2014, plaintiff Brian A. was working as a handyman running his own business, a job he had done for 15 years. He was married with eight children. But sometime that summer, he began experiencing unusual symptoms, including facial twitching and involuntary body movements. He also had abdominal pain and cognitive problems. He consulted with doctors in the Rockford area, but they could not provide a satisfactory explanation for these puzzling symptoms. Hoping to find a better answer, he travelled to the Mayo Clinic and underwent numerous tests and consulted with a team of doctors from different specialties. Eventually, the Mayo Clinic doctors diagnosed him with a "functional movement disorder" and also possibly depression. According to the Mayo Clinic website,[2] a movement disorder causes abnormal movements, either voluntary or involuntary, and a *functional* movement disorder is one *not* caused by neurological disease. One doctor likened it to a "software problem" of the brain. R. 367. Everyone agrees that it is an unusual and complex condition with no standard treatment

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.

[2] Mayo Clinic, Movement disorders, https://www.mayoclinic.org/diseases-conditions/movement-disorders/symptoms-causes/syc-20363893 (last visited Jan. 16, 2020).

approach. Plaintiff tried various therapeutic interventions recommended by the Mayo Clinic, and for a few periods, found some relief, even stating at one point that his improvement was miraculous. However, each time, the symptoms returned and even worsened. He quit his job as a handyman and sold his tools and applied for disability benefits. Frustrated with further relapses and the unpredictability of his symptoms, plaintiff returned to the Mayo Clinic four or five times over the next three years. Also, in 2015 and 2016, he participated in individual and marital counseling. All through this time, his care was overseen by Dr. Theodore Schock, his regular doctor, who submitted a letter stating that, "barring a miracle," plaintiff would never be able to work again. R. 560.

In September 2016, a hearing was held before an administrative law judge ("ALJ"). Plaintiff and a vocational expert testified, but no medical expert was called. In March 2017, the ALJ issued a ruling finding plaintiff not disabled. The main rationale was that plaintiff was able to do activities, such as fixing a dryer, and that this active lifestyle conflicted with his testimony. Plaintiff argues that this rationale was incomplete. He also argues the ALJ erred in not giving more weight to Dr. Schock's opinion.

## BACKGROUND

### A. Medical History

The facts set forth below, up to subheading B, are taken verbatim from plaintiff's opening brief with only a few minor stylistic changes.[3] It is not this Court's normal approach to incorporate a litigant's entire fact section in this manner, but this case is unusual because the Government, after reading plaintiff's fact section, declared that it was willing to "defer" to what it described as plaintiff's "skilled and very thorough telling of the facts." Dkt. #22 at 1, n.1.

---

[3] The Court has also omitted plaintiff's footnotes, which referred to websites explaining medical terms.

Given this generous acknowledgment, and mindful of saving judicial resources, the Court sees no need to prepare its own fact summary and will instead use plaintiff's even though it is probably more detailed than necessary.

Plaintiff was born on January 6, 1970, and was 44 years old on the alleged date of onset. R. 30, 89. He ran his own handyman/remodeler/repairman business from 1999 until the summer of 2014, last working full-time in May 2014, the month of his alleged date of onset. R.50, 176-179.

Plaintiff presented to the emergency department at Saint Anthony Medical Center on August 1, 2014 with facial twitching and involuntary movements in his face and upper body. R. 325. He was given Benadryl, which was noted to stop his muscle twitching and slurred speech. R. 306. The diagnosis was tardive dyskinesia. R. 325. On August 5, 2014, at a follow up with Rockford Gastroenterology Associates, Dr. Steven O. Ikenberry noted that plaintiff had continued taking Benadryl with limited relief. *Id*. The doctor observed that his involuntary facial movements continued. *Id*.

Plaintiff presented to the Mayo Clinic on August 22, 2014 for a neurology consult to evaluate his recent onset of abnormal movements. R. 364. The doctor noted that plaintiff began to experience tightening of his jaw with lower jaw protrusion about five weeks before his evaluation. *Id*. About three weeks before the evaluation, plaintiff developed the sudden onset of "jerking movements of the head, moving his head from side to side in a 'no-no' pattern." *Id*. These involuntary movements were accompanied by slurred speech, lip twitching and eye blinking. *Id*. Plaintiff told the doctor that he had been taking Norco and Bentyl for his chronic stomach pain and there was speculation that these medicines could be causing his involuntary movements. *Id*. He stopped taking these medications at that time, but the movements persisted.

*Id.* In the week before his evaluation, plaintiff also developed an abnormality in his gait and began having difficulties with balance. *Id.* During that time, he also developed occasional whole body shaking, in which his head and hips shake from side to side. *Id.* Due to the onset of these abnormal movements, the doctor noted, plaintiff had been referred from the gastroenterology clinic to the neurology clinic. (R.364, 379-381). A subsequent MRI of the brain showed a number of T2 hyperintensities in the subcortical white matter bilaterally, including a few in the corpus callosum. R.364. His movements were most consistent with a functional movement disorder and Plaintiff had evidence of major depression. R. 364-365.

Plaintiff was found to have clear evidence of a functional movement disorder, based on the characteristics of his movements as seen on examination, yet there was a lack of any clear abnormality on his brain MRI that would explain his symptoms. R. 366. The diagnoses were functional movement disorder and leukoaraiosis. *Id.* Plaintiff's MRI scan was abnormal, but the neurologist Dr. Cascino did not know what this signified. R. 367.

Plaintiff presented to Dr. Schock, his regular physician, in Rockford, Illinois, on October 20, 2014. R. 397. On examination, the doctor noted plaintiff's ataxic gait, which he described as "sometimes almost walking sideways." The doctor also observed spasms like torticollis in the neck and left jaw. R. 397. He noted that due to these spasms, plaintiff had some difficulty speaking and his thoughts were "slower to be expressed even though his intelligence does not seem to be affected." *Id.* Plaintiff returned to the Mayo Clinic on November 17, 2014 and began the one-week intensive Behavioral Shaping Therapy (BeST) Program in an attempt to correct his functional movement disorder. R. 411, 418. On November 21, 2014, he presented to a neurologist at the Mayo Clinic, reporting that the recovery he experienced while taking part in

the program was "miraculous" but his doctor urged him to pace himself and not

"plan to jump fully back info life within the next week," but rather to slowly reintroduce

employment, family care duties and other activities over the next two months. R. 419. The doctor

predicted he would be "back to himself" by the middle of January. *Id*.

Unfortunately, plaintiff's condition deteriorated in the following weeks and he returned to

the Mayo Clinic in February 2015 complaining about a variety of medical concerns and

symptoms. R. 526. His ongoing stomach pain had worsened and he reported extreme fatigue

and head pressure. R. 527. Plaintiff's doctor noted that plaintiff had "slowed, deliberate

conversational speech that seemed very labored." *Id*. That same day, he presented for a general

internal medicine consult. R. 522. The doctor was unsure as to whether his stomach pain was

functional dyspepsia or "more of a chronic abdominal pain picture" but also noted that Plaintiff

may have chronic fatigue syndrome. *Id*. Treatment notes stated that plaintiff had tried a gluten-

free diet, as well as eliminating eggs, soy, corn, dairy and GMOs from his diet, with no change in

symptoms. R. 519. He also complained of ongoing pressure headaches, mostly on the right side

of his head. *Id*.

Plaintiff returned to the Mayo Clinic on March 9, 2015 for an endocrinology

consultation. R. 516. The doctor diagnosed mild hypothyroidism and agreed with Dr. Schock's

earlier assessment, dating back to 2014, that Plaintiff would benefit from thyroxine replacement.

R. 516. That same day, he followed up with a neurologist, who noted that no worrisome causes

had been found for his multiple somatic symptoms. R. 515. The neurologist opined that

plaintiff's non-movement symptoms had become more prevalent than his movement disorder. *Id*.

On March 10, 2015, plaintiff presented to the gastroenterology and hepatology department at the

Mayo Clinic for a consultation. R. 512. The doctor noted various diagnostic tests conducted in

the past year had been unremarkable and that plaintiff's symptoms seemed "functional in nature and most likely related to visceral hypersensitivity." R. 514. The doctor opined that plaintiff had some element of constipation, along with evidence of a possible pelvic floor dysfunction on examination, which could lead to a buildup of stool and cause bloating and discomfort. *Id*.

Plaintiff returned to the Mayo Clinic on March 18, 2015 to discuss his test results. R. 510. He reported that his involuntary movements had returned and worsened with increased activity. *Id*. The doctor noted that these movements, including head shaking, were evident on examination. *Id.* On March 19, 2015, plaintiff followed up with the psychology department, reporting that he spent most of his days at home sitting in a chair, attempting to use the physical therapy techniques he learned in the movement disorder clinic in November 2014 to control his movement disorder. R. 507. He also noted that he had been trying to understand the potential triggers of reasons behind his ongoing physical symptoms, but he did not feel there were psychological factors affecting his symptoms. R. 508. Nevertheless, he and his wife were planning to start seeing a counselor to discuss the ongoing stress of plaintiff's symptoms and their impact on his marriage and family. *Id*. On May 12, 2015, he again returned to the Mayo Clinic for an evaluation of possible fibromyalgia and chronic fatigue. R. 496. The treatment notes stated that his movement disorder persisted and impacted his gait, speech and bodily movements. *Id*. Plaintiff also reported additional symptoms including decreased cognitive function, headaches, intermittent sore throat and post-exertional malaise. *Id*. On examination, the doctor noted that plaintiff appeared to be unbalanced when he walks and had "somewhat slowed and hesitant speech as well as abnormal movements of his head and extremities." R. 498. The doctor opined that plaintiff's presentation was consistent with chronic fatigue syndrome. *Id*. It was recommended that he return to the movement disorder clinic in August, but should seek

occupational and physical therapy in the interim. *Id.* The next day, he presented for a pain rehabilitation consult and an occupational therapy initial evaluation at the Mayo Clinic and was instructed as to appropriate home exercises for fibromyalgia/chronic fatigue. R. 490, 494. Plaintiff returned to the movement disorder clinic at the Mayo Clinic on August 17, 2015 to undergo intensive physical therapy. R. 479. He was noted to have been diagnosed with chronic fatigue and functional dyspepsia, in addition to his movement disorder. *Id.* While the intensive therapy initially appeared to help his movement disorder, symptoms of tremors and jerking were noted as well as difficulty speaking. R. 472. On August 20, 2015, the occupational therapist noted that plaintiff had made "some progress this week, albeit not to the same degree as he did in November and certainly not to the degree which we expect[.]" R. 467-468. On August 21, 2015, the therapist noted that plaintiff had not met treatment goals, but that "additional therapy would not be helpful due to lack of progress." R. 463. The therapist opined that plaintiff may benefit from intensive cognitive behavioral therapy once he returned home. *Id.* On August 24, 2015, plaintiff followed up with the neurologist at the Mayo Clinic, who noted his symptoms represent a functional movement disorder. R. 456. On August 27, 2015, plaintiff returned to the Mayo Clinic and presented to a psychiatrist, who diagnosed him with somatic symptom disorder/functional movement disorder; major depression, single episode, in remission; and chronic abdominal pain. R. 447. At a follow-up exam with his neurologist at the Mayo Clinic that same day, the doctor noted his neurologic symptoms did not have their basis in an organic disorder. R. 444. He recommended cognitive behavioral therapy and noted that the psychiatrist had suggested plaintiff begin taking Effexor.

Plaintiff treated with a counselor in 2015 and 2016 (R. 561-622, 623-658), and while his physical symptoms ebbed and flowed, with resulting changes in his physical activity level

depending on the severity of his symptoms, his condition gradually worsened. R. 560. On October 1, 2016, Dr. Schock wrote a letter outlining plaintiff's symptoms and noting "a progression of his condition over the past year." R. 560. Dr. Schock described plaintiff's symptoms as jerking of his head, arms and hands at unpredictable times; stuttering and difficulty finding words; unsteady gait; and that he had trouble concentrating and was easily fatigued. *Id*. He noted that plaintiff had stopped driving as he cannot control a car safely. *Id*. In January 2017, plaintiff returned to the Mayo Clinic for a neurology evaluation where the doctor noted that Dr. Schock had called to report that plaintiff's problems were worsening and now included "infrequent vocalizations with grunts, echolalia, and increasing disability." R. 659. On examination, the doctor noted that his gait and posturing were very stiff. R. 660. The neurologist opined that plaintiff's condition had progressed to where he has a "vast array of functional-type movements interrupting his ongoing activities. This has become extremely disabling." *Id*. The doctor noted that given the extensive testing they had done in the past, "[i]t is hard to know how to help. I do not think that another week-long BeST protocol would serve any purpose. He underwent the full protocol about a year ago and there was no benefit." *Id*.

### B. The ALJ's decision

On March 14, 2017, the ALJ issued a 13-page decision finding plaintiff not disabled. At Step Two, the ALJ found that plaintiff's had the following severe impairments: depression, somatic symptom disorder, and functional movement disorder. The ALJ found that plaintiff had the residual functional capacity ("RFC") to do sedentary work, subject to these restrictions:

> [H]e can use his hands no more than frequently to perform bilateral gross and fine manipulative tasks; he can balance only occasionally; he cannot climb ladders, ropes and scaffolds; he must avoid all hazards such as unprotected heights and dangerous moving machinery; and he must avoid concentrated exposure to extreme cold. In addition, the claimant is limited to the performance of simple, routine, repetitive tasks with no more than occasional changes or decision-

making, and no fast-paced, high pressure, assembly-line style work but end of day
work goals are acceptable.

R. 24.

In the first part of the RFC discussion, which was the longest part, the ALJ explained
why plaintiff's testimony was not credible. The main reason was that there were "many
statements" showing that plaintiff had done activities that, in the ALJ's opinion, went "well
beyond what [he] portrayed in connection with his application and appeal." R. 28. These
activities included volunteer work, handyman projects like fixing a dryer or painting a shed, and
leisure activities such as riding a bike. The ALJ also noted that there was little objective evidence
supporting plaintiff's allegations.

At the end of the discussion, which was the shorter part of the analysis, the ALJ
considered the medical opinions. The ALJ first gave "significant weight" to the State agency
opinions. It is a little unclear why the ALJ gave these opinions significant weight given that both
agency doctors concluded that plaintiff had *no* severe impairment and *no* limitations and given
that the ALJ disagreed with those findings. In any event, the ALJ offered three largely
boilerplate reasons for giving these opinions significant weight, which are discussed below. The
ALJ next considered Dr. Schock's one-page letter opinion dated October 1, 2016, finding that it
deserved "some, but not great, weight." R. 30, 560. The ALJ offered multiple reasons, which are
also discussed below. Finally, the ALJ considered a single statement from a Mayo Clinic doctor
who stated, during plaintiff's most recent visit in January 2017, that plaintiff's symptoms have
"become extremely disabling." R. 30. The ALJ rejected this statement because the doctor was
supposedly relying solely on plaintiff's "subjective complaints." *Id.*

## DISCUSSION

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). If supported by substantial evidence, the Commissioner's factual findings are conclusive. *Id.* Substantial evidence exists if there is enough evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

However, the Seventh Circuit has emphasized that review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (a "mere scintilla" is not substantial evidence). A reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). Even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). Moreover, federal courts cannot build a logical bridge on behalf of the ALJ. *See Mason v. Colvin*, No. 13 C 2993, 2014 WL 5475480, at *5-7 (N.D. Ill. Oct. 29, 2014).

Plaintiff raises a number of arguments for remand. They are all lumped together under a single, vaguely-worded heading entitled "The ALJ Rendered an Improper RFC Determination." Dkt. #13 at 9. In reviewing these arguments, the Court finds that they can best be grouped into two broader arguments.

**I.      The Credibility Analysis Was Flawed.**

The ALJ's main reason for finding plaintiff not credible—in fact, probably the central rationale of the opinion—was that plaintiff engaged in vigorous activities at odds with his portrayals of himself. The ALJ discussed these activities in multiple places throughout the opinion. The following list from the Government's brief provides a condensed overview:

> fixing a dryer, tuning a piano, tearing down a garden shed, modifying a water bed, exercising including lifting weights, selling a truck, organizing tools in his garage, volunteering as a hospice worker, performing significant work for his church, painting a building, volunteering at a food pantry, and even interrupting one [therapy] session to take a phone call from a neighbor to discuss a home improvement project.

Dkt. #22 at 4 (internal citations omitted). The evidence of these activities came from doctor and therapist treatment notes. The ALJ believed that plaintiff portrayed himself as an inactive person who, among other problems, had difficulty even cutting his food at dinner. The ALJ concluded that this discrepancy between plaintiff's activities and his testimony proved he was exaggerating his limitations. Although the ALJ did not explicitly accuse plaintiff of malingering, that word hovers over the opinion.

Plaintiff argues that this rationale overlooks a key fact. Plaintiff's symptoms fluctuated such that he had "good days" when he could do fairly vigorous activities and "bad days" when he was incapacitated. The word "days" could be replaced by "weeks" or "hours" depending on the relevant timeframe. According to plaintiff, if the ALJ had considered the oscillating nature of his symptoms, then the alleged discrepancies would have largely evaporated. Plaintiff notes that the Seventh Circuit has repeatedly faulted ALJs for not explicitly considering this issue. *See, e.g.*, *Fisher v. Berryhill*, 760 Fed. App'x. 471, 477 (7th Cir. 2019) (remanding: "Fisher's doctors opined that she was likely to experience good days and bad days, but the ALJ focused exclusively on Fisher's good days.").

This Court finds this argument persuasive. The record contains abundant evidence to support the factual predicate for the argument. To cite a few examples, at plaintiff's most recent Mayo Clinic visit, Dr. Drubach wrote as follows:

> Another interesting feature of [plaintiff's] syndrome is the presence of prominent fluctuations. On some days, he is "close to normal." He recalls a day a few weeks ago when he was able to help his wife scrub the floors and clean the kitchen, something that he normally is not able to do[.] His father tells me that on a few occasions his son can spend hours on the phone with him, but at other times he is exhausted after only a few minutes.

R. 662. Another example, also from the Mayo Clinic: "Consistent with this is the waxing and waning quality whereby there are times that Mr. [A.] is quite normal in speech and energy and other times when it is just the opposite." R. 444; *see also* R. 659 ("It should be noted that there is a great deal of variability [in his problems] over the course of the day. In general, he is much better in the morning and much worse later in the day. The more he tries to do, the worse he gets."); R. 289 ("Pt states that he has good days and bad days"). Plaintiff himself made this same point in his adult function report where he stated that, although he could sometimes do household repairs, it depended on his current condition. *See* R. 229 ("It depends – sometimes I feel almost normal and other times I can barely move.").

The ALJ failed to seriously consider this evidence. It was only mentioned in truncated form. The ALJ did not summarize the evidence cited above, and only made two brief passing references to the variability of symptoms. *See* R. 25, 29. But merely describing the evidence is not enough; the ALJ should have actually *considered* this fact when concluding that plaintiff was exaggerating—or, more bluntly, lying—about his condition. There is no evidence the ALJ did so. Instead, the ALJ gave the opposite impression, suggesting that plaintiff's activities were regular, ongoing, and frequent. *See, e.g.*, R. 25 (stating that plaintiff "in fact was frequently engaging in a wide range of activities"); R. 28 (observing that there were "many statements"

detailing plaintiff's activities). But words like "frequently" and "many" can be misleading if no timeframe is provided. Here, the record covers three to four years. So even if plaintiff did 10 to 15 projects, to pick a hypothetical number range for discussion purposes, this would not necessarily be frequent or regular, especially if the ultimate comparison point is whether he could consistently show up for work five days a week, all year round.

A broader problem with the ALJ's credibility analysis is that the ALJ focused almost entirely on plaintiff's daily activities and, to a lesser extent, on the lack of objective evidence. But the ALJ did not consider the other factors under SSR 16-3p. Most relevant, the ALJ gave no meaningful consideration to the extensive efforts plaintiff and his family made to treat his medical problems. *See* SSR 16-3p ("Persistent attempts to obtain relief of symptoms, such as increasing dosages and changing medications, trying a variety of treatments, referrals to specialists, or changing treatment sources may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent"). A notable fact about plaintiff's treatment is that he travelled to the Mayo Clinic four or five times. This undoubtedly involved much time and personal effort and perhaps even additional money (although the record is silent on this question). The mere fact that plaintiff and his family went to such lengths is a factor in his favor. It cuts against the idea that he was feigning symptoms to get benefits. In addition, he engaged in both individual and marital counseling, another effort that bolsters his credibility. The Court is not suggesting that this treatment is dispositive, but it should have been considered as part of a broader analysis.

At bottom, plaintiff's claim is that the ALJ seized upon the activities rationale at the outset and then combed through the record with the singled-minded purpose of confirming this pre-chosen thesis. However, the ALJ overlooked other pertinent evidence from these same

treatment notes. This evidence arguably supported plaintiff's case in various ways and generally painted a more nuanced picture of his overall condition.

For example, the ALJ reviewed notes from a September 9, 2015 Mayo Clinic visit. From these notes, the ALJ extracted the single fact that plaintiff was then "playing the piano, riding a bike, helping people by fixing things, and spending time with his family." R. 27. But these notes contain other facts casting doubt on the ALJ's unalloyed description. Most notably, the Mayo Clinic doctor concluded that neuropsychological testing should be done on plaintiff to ensure that they were "not missing a cognitive disorder." R. 460. The doctor observed:

> On evaluation today, the patient initially had quite reduced eye contact. He is notable for psychomotor retardation and decreased volume to his speech. On short-term memory testing, he could recall only three of five times at a three- to five-minute delay. He does have a somewhat flat affect with decreased range in mood reactivity and has no mood lability. He, for the most part, is goal directed in his thought form. He has no evidence of psychosis. He does appear alexithymic in that he has limited insight into his emotional world. He has no acute safety issues. His judgment is reasonable within the context of his insight.

*Id.* From this one page of treatment notes, two potential storylines emerge. The one the ALJ chose to tell was that plaintiff was capably doing physical activities. But another one, existing alongside this first one, is that plaintiff was having worrisome cognitive problems. The ALJ should have acknowledged this competing narrative even if it complicated the ALJ's thesis.

Another example. Plaintiff visited with his therapist, Roger Gasser, on June 24, 2015. R. 584. The ALJ extracted from these notes the single fact that plaintiff "reported being tired after 'Father's Day activities.'" R. 28. The implication was that he was tired because he had been so active. However, the notes convey a less rosy picture. A longer excerpt explains why:

> Client was at [a] fairly low point today. In both affect and physical strength. He complained of still being tired because of Father's Day activities, so speech was very labored and difficult for him. Of all sessions thus far, this was his hardest in terms of communicating what he wanted to say.

*       *       *

> Brainstormed ways client could communicate to his wife and children on days
> like today when "my face doesn't work," and he is unable to convey positivity to
> them, and thus they think he is unhappy. Problem is that "everything works
> together," if he can't make facial expressions, he can't form words either, or make
> physical movements.

R. 584. By leaving out this context, the ALJ painted a one-sided picture. *See Arnett v. Astrue*,

676 F.3d 586, 592 (7th Cir. 2012) (ALJs cannot ignore contrary lines of evidence).[4]

A third and final example. The ALJ noted several times that plaintiff was volunteering at

a hospice. R. 25, 28. However, the source material does not simply mention this bare fact

standing alone. Instead, it states: "Pt is unable to do much at home. He helps change laundry

when able. He cannot drive. He has night of unable to sleep. Abdominal pain. He was

volunteering at hospice as a visitor." R. 538. The ALJ left out this context and also left out

plaintiff's hearing testimony on this topic. Plaintiff testified that he only worked with one person

at the hospice and that a nurse there "got more concerned about" him than the patient he was

looking after upon seeing him "walk down the hall." R. 63. Plaintiff also was starting to "scare

people" because he would "make noises for no reasons." *Id.*

In sum, this Court finds that the ALJ on remand should more completely and fairly

consider the context surrounding plaintiff's activities, as well as their relative frequency, and also

should consider other factors bearing on plaintiff's credibility, including his extensive treatment.

---

[4] One issue that crops up in the therapy notes is a concern that plaintiff was straining to do more than he was capable of doing, perhaps out of a sense of familial duty. For instance, in the notes for the visit in which plaintiff was "showing a pretty good energy level despite his activity painting his dad's shed today," the therapist went on to state that he had discussed with plaintiff how his "duties and responsibilities change with [] physical circumstances." R. 562; *see also* R. 634 ("working with [plaintiff] to stabilize high and lows of cognitive expectations, and to deal with client's alarm at his inability to process thoughts"); R. 589 ("Client reported he likes plunging forward into activities rather than 'just waiting to get better' before he does anything.").

**II. The analysis of the medical opinions was flawed.**

Plaintiff's second major argument is that the ALJ conducted an incomplete analysis of the medical opinions. The Court finds that this argument provides another basis for a remand.

Plaintiff first criticizes the ALJ's decision to give "significant weight" to the opinions of the two state agency doctors. Exs. 1A, 3A. The ALJ gave three rationales: (1) these doctors were "highly qualified physicians"; (2) they had access to "much of the record"; and (3) they provided "detailed" findings in a "comprehensive" document. R. 30. Plaintiff argues that these rationales were conclusory. This Court agrees. The ALJ only provided one sentence, giving no details or explanation beyond the barebones assertions recited above. And plaintiff argues that these rationales are questionable. First, as for being highly qualified, plaintiff argues that this claim has not been supported by evidence. Plaintiff states that "internet searches for these medical experts provide little to no insight as they rarely appear to be actively practic[ing] doctors." Dkt. #13 at 11, n.9. The Government has not attempted to rebut this assertion. Second, plaintiff argues that the claim that these doctors had access to "much of" the record disguises the fact that they did *not* have access to other parts of the record. Based on the date of the agency opinions, it is undisputed that these doctors were not able to review a great portion of the Mayo Clinic records. Third, plaintiff questions the claim that these opinions were "detailed" or "comprehensive." After reading them, this Court agrees. The opinions contain mostly boilerplate, and the analysis is not complete nor easy to follow. There is, for example, little discussion of functional movement disorder.

But if this were the only error, it might be harmless given that the ALJ, despite going through the process of giving these opinions significant weight, in the end did not rely on them. Still, the ALJ's analysis was relevant when considering the analysis of Dr. Schock's opinion. It is

clear that the ALJ did not apply the same criteria, or the same degree of scrutiny, to these two sets of opinions. *See Murphy v. Berryhill*, No. 17 CV 50198, 2018 WL 6610287, *4 (N.D. Ill. Nov. 28, 2018 ) ("it is important that ALJs employ the 'same metrics' and the 'same level of rigor' in evaluating multiple opinions"); *Vandiver v. Colvin*, No. 14 CV 50048, 2015 WL 8013554, *3 (N.D. Ill. Dec. 7, 2015) ("the checklist has its greatest usefulness as a tool for making an apples-to-apples comparison between opinions."). Consider the issue of qualifications. The ALJ credited the agency doctors as being qualified but simply ignored this factor when evaluating Dr. Schock. All things being equal, a treating physician generally should receive more deference rather than a reviewing physician. *See Israel v. Colvin*, 840 F.3d 432, 437 (7th Cir. 2016) ("We give more weight to the opinions of treating physicians because they are most familiar with the claimant's conditions and circumstances."). The ALJ gave no weight to this factor.

Even if we ignored the differing criteria being applied, the ALJ's analysis of Dr. Schock's opinion was insufficient on its own terms. In his four-paragraph letter, Dr. Schock summarized some of plaintiff's treatment history and symptoms and then concluded as follows:

> I have only seen a [downward] progression of [plaintiff's] condition over the past year. He has not worked in a year. He has sold his truck/van and tools. I would consider him disabled from working ever again barring a miracle.

R. 560.

The ALJ gave this opinion "some, but not great, weight." R. 30. Plaintiff argues that it should have been given controlling (or at least significant) weight under the treating physician rule. The ALJ's rationales for not giving this opinion more weight were as follows:

> It is not completely clear that Dr. Schock understood the social security definition of disability. He may have simply been considering whether the claimant was able to do his very demanding former job. As noted, the RFC in this decision limits the claimant very significantly and also would not permit the performance of that job.

> Dr. Schock did not provide clear explanation of the exact cause of the claimant's many reported symptoms. Further, he did not have access to the entire record, which includes admissions of many activities that suggest an ability to perform a job that doesn't involve the many physical and mental demands that Dr. Shock may have been considering in making his statement. Some of Dr. Shock's opinion is based simply on the claimant's or his wife's statements as to symptoms around the house, symptoms that Dr. Shock did not himself observe or document during examinations.

R. 30.

The paragraph contains several rationales, but the "primary" one according to the Government's reading of the opinion is the assertion that "Dr. Schock did not articulate whether he believed plaintiff incapable of performing his past work as a handyman, or all work." Dkt. #22 at 4-5. This rationale, however, rests on a tenuous foundation. Dr. Schock never explicitly stated that his opinion was limited in the way the ALJ suggested. Perhaps, the reference to plaintiff having sold his tools could lend mild indirect support for the ALJ's theory. On the other hand, the various physical limitations Dr. Schock referred to in this letter—"trouble concentrating," "trouble finding words," "jerking of his head, arms, and hands at unpredictable times," and "fatigues very easily"—seem to be relevant to more than just doing handyman work. Ultimately, the ALJ's interpretation is speculative, as she implicitly concedes by using the phrase "may have been" to hedge her conclusion. Rather than engaging in speculation, the ALJ would have been on firmer ground if she had contacted Dr. Schock and obtained a clarifying opinion.

As for the criticism that Dr. Schock did not have "access to the entire record," the ALJ did not state specifically what records, or what treatments, Dr. Schock was unaware of. He was the primary care physician who treated plaintiff throughout this entire period. He was in contact with plaintiff's therapists and with the Mayo Clinic doctors. *See, e.g.*, R. 659 (Mayo clinic doctor discussed plaintiff's symptoms and diagnoses with Dr. Schock in a phone call); R. 289 (Dr.

Schock: "Records from Mayo Reviewed."); R. 564 (Dr. Schock and plaintiff's therapist had a 15-minute conversation about plaintiff's physical circumstances and his "activities").

As for the criticism that Dr. Schock "did not himself observe" all of plaintiff's alleged symptoms and limitations, this is true to some extent. But this criticism applied with even greater force to the agency doctors. And even if Dr. Shock did not observe all of plaintiff's symptoms, he clearly observed some of them. *See, e.g.*, R. 289 ("Speech varies between very slow to normal. Tremor to head. [Rhythmic] tremor to torso and some pelvic instability with walking."); R. 544 ("Pt has some stuttering. Difficulty with movements in jaw and arm movements."). In sum, the Court concludes that a more comprehensive analysis is needed before rejecting Dr. Schock's opinion. Again, the best course of action would be to get an updated opinion.

Although the above findings are sufficient to support a remand, the Court notes one additional area of concern. Plaintiff complains that the ALJ, in an effort to sound reasonable, included a series of RFC restrictions that plaintiff characterizes as window dressing. Plaintiff argues that the ALJ failed to provide a coherent explanation for why she chose these particular RFC limitations. Dkt. #13 at 13 ("In the end, one is left wondering exactly how the ALJ arrived at the RFC she provided."). Although plaintiff does not use the phrase "playing doctor," this is the implied accusation. *See, e.g., Akin v. Berryhill*, 887 F.3d 314, 318 (7th Cir. 2018) (remanding because the ALJ improperly played doctor).

The Government responds by suggesting that the ALJ was in a quandary, stuck between two sets of opinions that "could not have differed more materially." Dkt. #22 at 7. The agency doctors found *no* impairments at all, but Dr. Schock "went in the complete opposite direction, finding plaintiff not just unable to work, but 'disabled from working ever again barring a miracle.'" *Id.* (The Government leaves the Mayo Clinic out of this either-or picture, which seems

to be a large omission.) The gist of the Government's argument is that the ALJ, faced with this difficult choice, reasonably split the difference in finding that plaintiff had some RFC restrictions but not enough to keep him from doing sedentary work. But the Government's justification is not satisfying. Like the statistical parable of the man with one foot in a bucket of ice water and the other in a bucket of boiling water, simply averaging two extremes does not necessarily result in a happy or logical compromise. Plaintiff has a legitimate complaint that the ALJ did not explain what specific evidence she relied on in reaching each of the RFC restrictions. On remand, the ALJ should provide more explanation.

As for the ALJ's possible doctor playing, the Court notes that the ALJ gave mixed messages about plaintiff's functional movement disorder. On the one hand, the ALJ found that this disorder qualified as a severe impairment at Step Two and also later included several RFC restrictions based on it. On the other hand, the ALJ made comments throughout the opinion casting doubt on this diagnosis. In particular, the ALJ stressed that there was a "lack of supportive objective findings." R. 29. The net effect is that the opinion pulls in two competing directions. This tension is reflected in a "summary" paragraph toward the end of the decision where the ALJ first stated that there was no "clear explanation" for plaintiff's "reported symptoms." *Id.* This statement hinted at malingering. But then the ALJ seemingly rejected this suggestion, stating that it "is very important to emphasize that [plaintiff's] symptoms and limitations have to a very large degree been accepted, as reflected in the very significant limitations included in the RFC." *Id.* But then the ALJ reversed direction one more time, stating that the RFC limitations were included only because the ALJ had given plaintiff the "considerable benefit of the doubt." *Id.* After reading this paragraph, the Court is not sure whether the ALJ truly accepted that plaintiff had functional movement disorder.

On remand, the ALJ should call a medical expert to help navigate these issues. Also, the ALJ should obtain an updated opinion from Dr. Schock to eliminate any ambiguity about the scope of his opinion. Medical expertise is needed because, as both sides agree, plaintiff's condition is complex, and this is not "the regular run-of-the-mill disability case." Dkt. #22 at 1.

## CONCLUSION

For the above reasons, plaintiff's motion for summary judgment is granted, the Government's motion is denied, and the case is reversed and remanded for further proceedings.


Date:  January 17, 2020                    By:

                                               Lisa A. Jensen
                                               United States Magistrate Judge